## APPEALS OF W. S. BUCK MERCANTILE CO.

Docket Nos. 86, 2007. Promulgated February 21, 1927.

1. Petitioner is engaged in the merchandise business on the installment sales plan. At the close of each operating year it set up on its books an account designated "Reserve for cost to collect bad accounts," and, in its income and profits-tax returns for such years, deducted from its gross income the amounts so added to the reserve as collection expense. *Held*, that such method of accounting does not clearly reflect income.

2. Evidence of abnormalities in income or invested capital *held* insufficient to entitle petitioner to relief under the provisions of section 328 of the Revenue Act of 1918.

*Battle McCardle, Esq.*, for the petitioner.
*Briggs G. Simpich, Esq.*, for the Commissioner.

These are appeals from determinations by the Commissioner of deficiences in income and profits taxes for the years 1918, 1919, and 1920, in the amounts of $3,206.37, $4,596.73, and $7,690.51, respectively. The issues are: (1) The addition, by the Commissioner, to the net income reported for the years 1918, 1919, and 1920, of the amounts of $7,362.76, $12,027.98, and $17,499.33, respectively, deducted by the petitioner as anticipated cost of collection and losses, in future years, of the outstanding accounts receivable at the close of each year; and (2) whether petitioner is entitled to have its profits taxes for the year 1918 determined in accordance with the provisions of sections 327 and 328 of the Revenue Act of 1918. Except for the issue of special assessment, which applies to the year 1918 only, the facts and issues, except as to the amounts involved, are identical for all years; therefore, by agreement of counsel, the appeals were consolidated and heard together.

### FINDINGS OF FACT.

Petitioner, a Kansas corporation with its principal office at Kansas City, was organized on or about July 11, 1917, for the purpose of taking over that part, known as the Lincoln (Nebraska) branch, of the business theretofore conducted by the Price Mercantile Co. Throughout the years under consideration, it was engaged in the retail sale, on the installment plan, of house furnishings, such as bedspreads, blankets, clocks, lace curtains, rugs, silverware, and table linens. The business policies, as they related to sales, collections, and methods of accounting, were precisely the same as those in effect during the ownership of the business by its immediate predecessor.

Generally, petitioner's sales are made through solicitors or agents who canvass industrial centers and country districts, going from

home to home, selling direct to the purchaser. The goods are usually carried on trucks by the agents, and delivery is made upon payment by the purchaser of the initial payment and reconveying title to the petitioner by deed of trust, without investigation as to the financial standing of the purchaser. The purchasers are usually of the laboring class, which is more or less transient.

Salesmen are employed on a salary and commission basis. The initial payments for each sale, as received, are applied in their entirety by the petitioner to the payment of the salesman's commission until the said commission has been paid in full. The salesman is held responsible for the sale, and accountable for the goods delivered, but after the purchaser makes the first installment payment, the salesman is relieved of any further responsibility for any loss which may occur through failure of the purchaser to meet subsequent installment payments. Should the purchaser default in the first payment, the salesman is required to stand one-half of any loss which may result from the transaction.

The average sale seldom exceeds the sum of $25. The initial payment usually is from 5 to 10 per cent of the selling price, the balance being paid in weekly installments. The weekly installments are fixed in such amounts that the account will be paid within six months.

Not more than 5 per cent of the total installment payments are made by mail or at the petitioner's offices. The balance of the collections are made by the petitioner's collectors. The latter are employed on a salary and commission basis, the commission being computed at a fixed percentage of the collectible accounts on the collector's books. Frequently collectors find it necessary to make more than one call upon a customer to collect an installment which has become due.

It is the accounting practice of the petitioner to charge off, as bad debts, accounts of customers residing within the limits of territory covered by a city collector, after failure to make installment payments for a period of 60 days. In the cases of customers residing in districts covered by rural collectors, the accounts are charged off as bad debts after 90 days have elapsed from the date of the last installment payment. If, and when, further collections of installment payments are made upon accounts previously charged off as bad, these accounts are restored on the books. Only the net amount, representing the difference between the total accounts charged off and the total accounts restored, in any year, has been claimed as a deduction for bad debts in income-tax returns.

The merchandise sold by the petitioner is subject to rapid and considerable wear and tear. It has been the petitioner's experience that repossessed merchandise is usually in such condition that its resale can only be made at a loss. When goods are repossessed because of failure to meet installment payments, the customer's account is credited with the amount of the unpaid balance of the selling price, and, at the same time, a like amount is charged on the books as the cost of repossessed merchandise. If the repossessed merchandise is still on hand at the close of the year, it is included in the inventory at its original cost.

The petitioner's books of account have been maintained in accordance with the accrual method of accounting, and the net income reported in the income-tax returns, for the three years under consideration, has been computed in accordance with that method.

At the time of taking over the business, the petitioner, following in principle the accounting practice of the predecessor owner, set up in its books of account an account designated "Reserve for cost to collect and bad accounts," in the amount of $5,061.46, which represented 26 per cent of the book value of the accounts receivable taken over. Thereafter, and during the years under consideration, the petitioner has added annually to this reserve an amount equal to 26 per cent of the increase in the accounts receivable outstanding at the close of the year. The amounts thus added to the reserve each year have been deducted from income in the petitioner's tax returns as collection expense. The amounts so deducted are, for the year 1918, $7,362.76; for the year 1919, $12,027.98; and for the year 1920, $17,499.33. The accounts receivable outstanding at the close of the year 1921 were, in the aggregate, $20,932.38 less than the aggregate outstanding at the close of 1920; hence, the petitioner reduced the reserve by the sum of $5,441.55, or 26 per cent of the decrease, which it included in taxable net income for that year. Upon audit of the petitioner's income and profits-tax returns for the years involved, the Commissioner added the amounts so deducted to gross income for each of the several, respective, taxable years.

The purpose for which this reserve account was established was to provide a reserve out of each year's earnings, to take care of (1) the cost of collecting, in a later year, the accounts receivable outstanding at the close of each year, (2) such of those accounts which may in a later year prove to be worthless, and (3) losses which may be sustained in a later year upon the sale, at less than cost, of repossessed merchandise. This accounting practice has been adopted by at least two competitor companies. The following shows the condition of the reserve account at the close of each of the years under consideration, and the manner in which it was built up:

| | |
|---|---:|
| Amount credited to reserve at time of taking over the business_____ | $5, 061. 46 |
| Amount added to reserve in 1917 (26% of increase of $16,848.98 in accounts receivable)_____ | 4, 380. 74 |
| Amount of reserve at close of 1917_____ | 9, 442. 20 |
| Amount added to reserve in 1918 (26% of increase of $28,182.35 in accounts receivable)_____ | 7, 362. 76 |
| Amount of reserve at close of 1918_____ | 16, 804. 96 |
| Amount added to reserve in 1919 (26% of increase of $46,397.45 in accounts receivable)_____ | 12, 027. 98 |
| Amount of reserve at close of 1919_____ | 28, 832. 94 |
| Amount added to reserve in 1920 (26% of increase of $67,308.12 in accounts receivable)_____ | 17, 499. 33 |
| Amount of reserve at close of 1920_____ | 46, 332. 27 |

The entire collection expense incurred in each of the years under consideration, and the total bad debts charged off on the books during each of those years, have been claimed as deductions in the petitioner's income-tax returns.

From the date of organization until at or about October 1, 1919, the business of petitioner company was carried on at the personal residence of its secretary. During that period the petitioner maintained no other place for the transaction of its affairs. The facilities of the secretary's residence, such as light and telephone, were used in the conduct of petitioner's business. During the period stated, no rental was paid to the secretary for the use of his residence and its facilities for office purposes.

Until June 1, 1918, the secretary was in the employ of the predecessor owner of the business, notwithstanding which he attended to a considerable part of petitioner's business affairs, matters of office routine, and keeping the books of account. For these services he was paid, during the first five months of the year 1918, compensation at the rate of $120 per month.

Prior to the organization of the petitioner, its president had been employed for approximately twenty years by the predecessor owner of the business, as general manager. His compensation, including commissions, was from $10,000 to $12,000. During the first five months of 1918, he devoted his entire time to petitioner's business affairs, and during that period, was paid compensation at the rate of $250 per month. His salary has since been increased to $16,000 per annum.

The gross sales shown by the return for the year 1918 amounted to $227,402.18. The total deduction claimed in that return, as compensation of officers, is $8,100.

During the year 1918, the total capital stock outstanding was $50,000, and the petitioner's average indebtedness for the last nine months of that year was $59,192.47.

OPINION.

Lansdon: It should be stated at the outset, that while the petitioner was engaged, during all of the years under consideration, in the sale of merchandise on the installment plan, the appeal raises no question as to its right to compute its net income on the installment basis. The books of account were maintained in accordance with the accrual method of accounting; the net income reported in the returns of the several years under consideration was computed in accordance with that same method; and the petitioner contends that no other method of accounting will clearly reflect its net income.

The first issue raised is whether the additions made to the "Reserve for cost to collect and bad debts," in each of the years under consideration, represent unrealized profits which should be excluded from gross income, or, in the alternative, whether the amounts thus set aside to the reserve in each year constitute allowable deductions in computing taxable net income. The petitioner contends that a portion of the annual increase in accounts receivable represents unrealized profits and should be excluded from gross income, because, in a later year, there will be expenses incurred in the collection of these accounts and some of the accounts will prove to be worthless. It submits an alternative contention, that the annual additions to the reserve are allowable deductions from income, under the provisions of section 234 (a) (4) of the Revenue Act of 1918, as losses sustained during the taxable year, and not compensated for by insurance, or otherwise.

The accrual method of accounting requires that at the end of every accounting period all income which has been earned must be accounted for as income accrued in that period. This is true notwithstanding that the income is not due and will not be collected until some future date. *Appeal of Owen-Ames-Kimball Co.*, 5 B. T. A. 921. The increase in the accounts receivable, in any one of the years under consideration, resulted from sales transactions entered into and completed within the year. All of the incidents which entitled or required the petitioner, under the method of accounting employed, to accrue these accounts receivable and the profits represented thereby on its books of account, had taken place before the close of the year. There remained nothing further to be done on the part of the petitioner lawfully to entitle it to receive the full amount of these accounts. The acts of sale and the performance by the petitioner of all of its obligations under the sales contracts, determined the earning of the income. There can hardly be any question that the income represented by the increase in the accounts receivable in each of the years under consideration was earned in those respective years. The statutory definition of gross income, as

laid down in section 213(a) of the Revenue Act of 1918, does not differ from the accounting conception of gross income. In a merchandising business, such as that in which the petitioner is engaged, the "gains, profits, and income derived * * * from * * * sales" are represented by the excess of the aggregate selling price over the cost of goods sold. This is a simple and elementary principle of accounting, which is generally understood, and needs no elucidation on the part of this Board. If the income is to be reduced in some manner by the estimated expenses of collecting it at some time in the future and the estimated amount thereof which may not be collected, then, the reduction must take the form of a statutory deduction from income, authority for which must be found under the provisions of section 214 (a) or section 234 (a) of the Revenue Act of 1918. The estimated amounts, if actually earned, can not be excluded from gross income on the ground that they are unrealized profits.

It is apparent from the mere reading of the provisions of section 214 (a) (4) of the Revenue Act of 1918, and the corresponding provisions of section 234 applicable to corporate taxpayers, upon which the petitioner relies as authority for its alternative contention that the annual additions to the reserve are proper deductions from gross income as losses, that those sections afford no basis for its contention. Both of the sections referred to provide for the deduction of "Losses sustained *during the taxable year*," and not of losses which may or may not be sustained in some future year. Nor do we upon examination of the provisions of those entire sections— and they constitute the whole authority for the deduction of business expenses—find any basis for the deduction of these annual additions to the reserve. On the contrary, we find that the deduction to be allowed for bad debts is the total "debts ascertained to be worthless and charged off within the taxable year," and in the case of business expenses "all the ordinary and necessary expenses paid or incurred during the taxable year." There was no ascertainment during the taxable years in question that a portion of the outstanding accounts receivable, at the close of each of those years, were worthless; nor were the expenses incident to the collection of those accounts at some future date, paid or incurred within the taxable years. See *Appeal of Morrison-Ricker Mfg. Co.*, 2 B. T. A. 1008.

Certain facts were developed by testimony during the hearing which, though not so indicated at the time by counsel, were apparently intended to show that the petitioner was entitled to have its profits taxes for the year 1918 determined under the special relief provisions of the applicable act. Those facts are entirely too meager and insufficient to warrant a conclusion that there existed, during the year 1918, any abnormalities affecting net income or invested

capital to such an extent as to work upon the petitioner an exceptional hardship which, if true, would have entitled it, under the provisions of section 327 (d) of the Revenue Act of 1918, to have its profits tax liability determined in accordance with section 328 of the Act. Therefore, the relief for which petitioner prays must be denied.

*Judgment will be entered for the Commissioner.*

PHILLIPS dissents.